UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

WAYMON COSTNER,

    Defendant.

Case No. 23-20110
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING MOTION TO SUPPRESS [18]**

While sitting in their police car outside of a gas station convenience store, two Detroit police officers saw what they believed to be an imprint of a gun in Waymon Costner's jacket pocket. So the officers got out of the police vehicle and asked Costner whether he had a concealed pistol license (CPL).

In response, Costner stated that he did not have a gun. Costner moved toward the officers while touching his right jacket pocket and turning the right side of his body away from the officers. As Costner did this, one officer walked toward him, again asked him if he had a CPL, and pointed to his right jacket pocket. Within seconds, the officer grabbed Costner's left arm as his partner approached on Costner's right and recovered a firearm from Costner's right jacket pocket.

Costner was charged with being a felon in possession of a firearm. He seeks to suppress the firearm and some statements he made to officers while in the police car. (ECF No. 18.) The government opposes the motion (ECF No. 24), and the Court held an evidentiary hearing on July 19, 2023.

Because the officers had a reasonable and articulable suspicion that Costner was violating the law when they seized him, the motion will be DENIED.

I.

On January 14, 2023, Detroit police officers Charles Brotzke, Janelle Thomas, and Anthony Williams were on routine patrol when they stopped at a gas station so Williams could use the restroom. Brotzke, who was driving, parked the semi-marked police car parallel to the gas station convenience store in front of the door, about one car-width away from the store. (Gov't Video Ex. 3, 1:10.) The driver's side was closest to the door, and the driver's window was in line with the front door:



(*Id.*)

Video footage captures Williams passing by an individual—now identified as Waymon Costner—exiting the store as Williams walked inside. (Gov't Video Ex. 3, 1:29.) Williams walked into the store without stopping Costner. Brotzke and Thomas remained in the police car.

Costner—seen in the blue jacket below—walked toward the police car to get to his car—the black SUV—which is parked diagonally in front of the police car.

2



(Gov't Video Ex. 3, 1:32.) Brotzke testified that, as Costner walked toward the police car, he observed an imprint of a gun in Costner's right jacket pocket. Brotzke described it as a "distinct triangle-shaped imprint leaning toward the front" of Costner's pocket. He said he saw the imprint of the slide and parts of the hand grip. He also testified that the apparent weight and size of the object in the pocket led him to believe it was a firearm.

Immediately after Costner walked past Brotzke's door, Brotzke exited the police car and made a "card" gesture toward Costner—i.e., he mimed holding a CPL with his pointer finger and thumb.



3

(Gov't Video Ex. 3, 1:35; Gov't Video Ex. 2, :31.) As Brotzke confirmed at the hearing, audio from inside the police car reveals him saying, "Boss, boss, my man," to get Costner's attention, and then asking, "Do you have a CPL?" (Gov't Video Ex. 1, :39–:43.) Thomas also left the police car at that moment, and asked Costner a similar question regarding a CPL. According to Brotzke's police report, Costner responded that he did not have a gun. (ECF No. 18-2, PageID.66.) Brotzke walked toward Costner after asking if Costner had a CPL.

As Costner turned around to face Brotzke, he touched his right jacket pocket.



(Gov't Video Ex. 1, :45.) Costner then started walking toward Brotzke while turning his right side away from him.



4

(Gov't Video Ex. 2, :34–:36.) Brotzke testified that he observed Costner doing both of these things.

As he walked toward Costner, Brotzke said he again asked Costner for a CPL while pointing to his right pocket. (ECF No. 18-2, PageID.66.) At the same time, Thomas started moving from her passenger side door toward Costner. (Gov't Ex. 2, :37.)

Eleven seconds after the encounter began, Brotzke grabbed Costner's left wrist. (*Id.* at :41.) Thomas went to Costner's right side and recovered a firearm from his right jacket pocket. (*Id.* at :42–:51.)

Costner was indicted on one count of being a felon in possession of a firearm. (ECF No. 10.) He moved to suppress the firearm under the Fourth Amendment and to suppress statements he made to officers in the police car under the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966). (*See* ECF No. 18, PageID.54, 58.)

## II.

These issues, however, have since narrowed in a couple of ways. For one, the parties stipulated that Costner's statements would not be used at trial other than for impeachment purposes. As such, the *Miranda* issue raised in the motion is moot, and the Court will deny the motion to suppress on that issue.

For two, at the hearing, Costner's argument in favor of suppression changed. In his motion, Costner stated that he "was seized when Officers Brotzke and Thomas physically grabbed his person." (ECF No. 18, PageID.55.) The government does not

seem to contest that conclusion. But at the hearing, Costner argued he was actually seized at an earlier point—when the two officers got out of their vehicle and "converged" on him while asking him if he has a CPL.

Given this focus, the Court begins by pinpointing the moment Costner was seized, and then evaluates whether the officers had reasonable and articulable suspicion for this seizure based on what they knew at the time.

### A. Seizure

Before addressing the parties' positions, a brief summary of Fourth Amendment law is helpful.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "Interactions between the public and police officers fall into three categories: 'consensual encounters in which contact is initiated by a police officer . . . ; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause." *United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. 2021). A suspect is seized within the meaning of the Fourth Amendment once a consensual encounter becomes a *Terry* stop. As such, it is at that point "the police officer must have a reasonable suspicion of criminal activity" to justify the stop. *Id.* (citing *United States v. Campbell*, 486 F.3d 949, 953–54 (6th Cir. 2007)).

To determine whether an officer "seized" an individual, the Court must evaluate whether the officer "restrain[ed] the person's freedom of movement by

6

means of physical force or a show of authority." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). Put differently, the Court must determine whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010) (citations omitted). By contrast, a person is not seized merely "because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Determining when a person has submitted to police authority is an objective inquiry that takes into account all the facts and circumstances of the stop." *United States v. Johnson*, 631 F. App'x 299, 302 (6th Cir. 2015).

To guide this circumstance-based inquiry, the Supreme Court has identified some factors that may indicate a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554. The Sixth Circuit has elaborated on these factors, providing that "the purpose of the questioning," "whether the place of questioning was hostile or coercive," "the length of questioning," and "other indicia of custody such as . . . whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police" could indicate whether a reasonable person would feel they are free to leave. *See Lewis*, 843 F. App'x at 688–89 (citing *United Sates v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003)).

Based on these factors, the Court finds that Costner was not seized until Brotzke touched his arm. (Gov't Video Ex. 2, :40; Gov't Video Ex. 3, 1:43.) Costner's argument that he was seized when the two officers left their vehicle and questioned him about having a CPL is unpersuasive. There are about eleven seconds between the officers' initial contact with Costner and the moment Brotzke touched his wrist. (Gov't Video Ex. 2, :340–:41.) Thus, the length of questioning does not weigh in favor of finding seizure before Costner was physically apprehended. Moreover, the officers did not display or draw a weapon or activate their emergency lights. *See U.S. v. Campbell*, 486 F.3d 949, 956 (6th Cir. 2007) (finding that Campbell was not seized in part because the officer had "neither drawn his weapon nor activated his emergency lights or siren"). And the first time they touch Costner is when Brotzke reaches for his wrist.

As to the questions themselves, Brotzke's tone was casual, and the words he used were similarly non-commanding. (Gov't Video Ex. 1, :39–:43.) He stated, "Boss, boss, my man," to get Costner's attention, and then asked, "Do you have a CPL?" *Id.* These words do not suggest that the individual must remain in the presence of officers. *See U.S. v. Smith*, 594 F.3d 530, 538 (6th Cir. 2010) (finding that the defendant was seized when an officer asked him to stop). The officers also asked their questions at a busy gas station with at least five other cars and five other people in view. (Gov't Video Ex. 2, :41; Gov't Video Ex. 3, 1:39.) And Costner was not blocked in or unable to move until Thomas came to his right side, which was around the time Brotzke grabbed his arm. (Gov't Video Ex. 2, :38 (Thomas approaching Costner), :40

8

(Brotzke grabbing his arm).) Before Thomas approached, Costner was able to move away from the officers toward his right. (*Id.* at :30–:39); *see also Lewis*, 843 F. App'x at 689 ("Lewis's exit was not blocked; he could have walked away down the other end of the alley or walked around Oliver's patrol vehicle.").

Costner argues that both officers "simultaneously leaving their vehicle" and "converging on him" while asking him for a second time about a CPL turns the encounter into a seizure. But the Court disagrees to some extent that the officers converged on him. Thomas stood outside of the passenger side door of the police car until just a few seconds before Brotzke grabbed Costner's arm. (Gov't Video Ex. 2, :32–:37.) So to the extent the officers did "converge" on Costner, it was not until Brotzke was already next to Costner and asking him whether he had a CPL for a second time. (*Id.* at :38.) In other words, the officers did not converge on Costner as soon as they exited the car. However, even if Costner is correct on the facts, the case law does not support his conclusion that these actions amounted to a seizure. *See United States v. Smith*, 594 F.3d 530, 538 (6th Cir. 2010) ("[T]he fact that uniformed police officers here were asking Smith questions while surrounding him on both sides, in close physical proximity, with another officer at some distance in front of him, did not make the encounter non-consensual."); *see also United States v. Fonville*, 127 F. Supp. 3d 790, 796 (E.D. Mich. 2015) ("He is not seized even when he is approached by more than one uniformed officer[.]" (citing *United States v. Frazier*, 936 F.2d 262, 265 (6th Cir. 1991))).

9

Despite this, it appears that Costner places strong emphasis on the fact that the officers exited their vehicle. The Court recognizes that the Sixth Circuit has affirmed a finding that no seizure occurred where officers questioned an individual but remained in their car. In that case—much like in this one—the individual "voluntarily walked toward the police car through the well-lit parking lot of the liquor store, with customers coming in and out," and "had an unobstructed path to walk away." *U.S. v. Preston*, 579 F. App'x 495, 499 (6th Cir. 2014). The individual was questioned by an officer using "a conversational tone" and without the officer "drawing his gun," "accusing [the individual] of wrongdoing, or physically touching him." *Id*. But importantly, in *Preston*, the officer "remained in the vehicle without opening his door[.]" *Id*.

The Court does not take the Sixth Circuit's ruling in *Preston* to mean that the line of seizure is at the car door. Indeed, the Sixth Circuit has held that officers approaching a vehicle where one goes to the driver's door and one goes to the passenger's door "by itself . . . does not make the encounter non-consensual." *U.S. v. Carr*, 674 F.3d 570, 573 (6th Cir. 2012). This says nothing of the precedent that has found encounters to be consensual despite the individual being questioned by officers on either side of them. *See Smith*, 594 F.3d at 538. The Court recognizes that Costner is not arguing that the mere act of exiting the car was enough for seizure. Rather, he argues that it is the combination of the officers leaving the car, questioning Costner, walking toward him, and approaching him on either side that made it so a reasonable

10

person would not feel free to leave. But the Court cannot square that argument with Sixth Circuit precedent.

The Court understands that Costner himself may not have felt free to leave. But the standard for seizure is an objective one. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004.) And under current Sixth Circuit law, two uniformed officers approaching an individual—without drawing any weapons, turning on their emergency lights, using a hostile or commanding tone, touching the individual, or blocking his exit—and asking whether he has a CPL is not a seizure under the Fourth Amendment. The encounter only became a seizure once Brotzke grabbed Costner's wrist.

### B. Reasonable and Articulable Suspicion

Having narrowed down the point of seizure, the Court now evaluates whether the officers had reasonable and articulable suspicion for this seizure. It finds that they did.

"*Terry* . . . permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *See U.S. v. Davis*, 514 F.3d 596, 607–08 (6th Cir. 2008). "Reasonable suspicion consists of more than a mere hunch, but 'is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *Lewis*, 843 F. App'x at 690 (quoting in part *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). An officer's suspicion must be based on "specific, objective facts" based on the "totality of

the circumstances in place at the time of seizure." *Id.* (citations omitted). An officer may rely on his training and experience to "make inferences from and deductions about" the circumstances he observes. *Id.* (citations omitted).

The Court finds that Brotzke's seizure of Costner was justified based on the multiple indicators of criminal activity he observed.

Start with Brotzke's observations of Costner as he was leaving the gas station convenience store. Brotzke had an unobstructed, close view of Costner in a well-lit area. He credibly testified that, while he was in the driver's seat of a police car parked in front of the exit, he saw "an individual exit the store walking directly toward [his] vehicle where [he is] sitting with what appeared to be a handgun in [the individual's] jacket pocket." He explained that, though he did not see a firearm, he saw a "distinct triangle-shaped imprint leaning toward the front of" the individual's pocket. He said he "clearly" saw "the imprint of the slide, the side of it and parts of the hand grip." He further testified that the weight of the object as it sat in Costner's pocket and the size of it indicated to him, based on his training and experience, that it may have been a firearm. Corroborating this conclusion, Brotzke can be seen immediately asking Costner for a CPL upon seeing him, and also points to the pocket where he testified he saw an imprint of a gun. (Gov't Video Ex. 2, :31, :37.) An officer's observation of an "imprint" of a firearm has been held to be sufficient to establish reasonable suspicion. *See United States v. Capozzoli*, No. 22-20005, 2022 WL 3044818, at *1, 5 (E.D. Mich. Aug. 2, 2022) ("Officer Vansickle communicated that it appeared Defendant had the imprint of a pistol on his right side. . . . Having *seen* a

12

concealed weapon, the officers had reasonable suspicion to investigate whether Defendant in fact had a firearm on his person, including by approaching him and asking Defendant questions.").

But there is more. Following his observation of what he believed to be a firearm, Brotzke asked Costner whether he had a CPL. Brotzke testified that Costner "grabbed over the pocket" containing the suspected firearm and "bladed his body" upon hearing the question. "Blading" refers to a suspect turning away from officers, and here, Brotzke said he saw Costner position the right jacket pocket against an adjacent car and away from him. As for grabbing the object over the pocket, Brotzke testified that this is known as a "retention check," which refers to habitually touching one's clothes or a specific object to ensure it is both out of sight and still on one's person. The video evidence of the encounter corroborates Brotzke's observations. Costner is seen touching his right jacket pocket—which was ultimately revealed to contain the firearm—and moving the pocket away from officers when he turns back to answer their questions. (Gov't Video Ex. 1, :45; Gov't Video Ex. 2, :36.) And Brotzke testified that once Costner had grabbed the object over his pocket, he could "very clearly" see what it was through the fabric.

The Court breaks no new ground by concluding that the imprint, combined with the retention check and blading, reasonably indicated to Brotzke that Costner was concealing a firearm.[1] *See, e.g.*, *Lewis*, 843 F. App'x at 691; *Pennsylvania v.*

---

[1] The Court understands Costner's argument to be that the blading and retention check occurred after Costner had already been seized—thus taking those two factors out of the reasonable-suspicion equation. As discussed, the Court

13

*Mimms*, 434 U.S. 106, 112 (1977) ("The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer."); *United States v. Stennis*, 457 F. App'x 494, 500 (6th Cir. 2012) (finding reasonable suspicion where "Officer Roncska brusquely asked Stennis if he had anything 'in there' while indicating Stennis' waist area and quickly initiated the search. Coupled with the testimony Officer Roncska provided at the hearing, we find that the district court did not err in crediting Officer Roncska's testimony that he observed a suspicious bulge in Stennis' pants"); *United States v. Bell*, 572 F. App'x 417, 419 (6th Cir. 2014) ("The officer's belief, based on his eyewitness observations, that the defendant had a bulge in his pocket that was in the shape of a gun provides 'reasonable suspicion' under the *Terry* doctrine that the defendant was carrying a concealed pistol.").

And having reasonable suspicion that Costner had a firearm—and failed to produce a CPL—provided a reasonable basis to conclude he was involved in criminal activity. Michigan law makes it unlawful to "carry a pistol concealed on or about [one's] person . . . without a license to carry the pistol as provided by law." Mich.

---

concluded Costner was seized the moment Brotzke grabbed his arm, which was after the retention check and blading. But even if the Court were to agree with Costner's argument that the moment of seizure occurred when the officers "converged" upon Costner, the Court finds that such convergence also occurred *after* Costner had "bladed" and done a retention check of the object. (Gov't Video Ex. 1, :45 (retention check), :50 (Thomas approaches Costner); Gov't Video Ex. 2, :35 (blading), :38 (Thomas approaches Costner).) So concluding that Costner was seized once the officers converged on him would not change this Court's conclusion on whether there was reasonable suspicion.

Comp. Laws § 750.227(2). When Brotzke asked for a CPL, Costner responded, "I don't have a gun"—not that he had a license. (ECF No. 18-2, PageID.66.)

A person must have a CPL with him "at all times he . . . is carrying a concealed pistol" and must "show" the license "upon request" by a police officer. Mich. Comp. Laws § 28.425f. So having concluded that Costner had a firearm based on the imprint of the object, the retention check, and the blading, and not receiving proof of a CPL upon request, Brotzke had reasonable suspicion to grab Costner's arm and detain him in order to investigate whether Costner was illegally carrying a concealed weapon. *See United States v. Bridges*, No. 16-20089, 2016 WL 3922354, at *6 (E.D. Mich. July 21, 2016) ("When the police officers saw the outline of a gun in the defendant's pocket, it was proper, under Michigan law, to inquire whether the defendant was in possession of a concealed carry license. The failure to produce the license supported the conclusion that the defendant was committing a felony."); *United States v. Patterson*, No. 22-CR-20269, 2023 WL 4290051, at *4 (E.D. Mich. June 30, 2023) ("[The officer] stated that he observed an L-shaped object in the left pocket that, in his experience, was consistent with the size and shape of a firearm. He also testified that, unlike the right pocket, the left pocket of [defendant's] sweatshirt was weighed down, which suggested that there was a somewhat heavy L-shaped object in that pocket. [The officer and defendant] made eye contact as [defendant] exited the gas station, after which [his] body movement changed. [Defendant] stiffened his left arm and held it closer to the left side of his body, over the left pocket, and he 'bladed' away so that the left side of his body was out of [officer's] view. . . . With these observations

15

and conclusions drawn by [the officer's] experience, [the officer] had reasonable suspicion that [defendant] was carrying a concealed weapon without a license, and he was, therefore, justified in conducting a stop to investigate whether [defendant] was engaged in criminal activity.").

In sum, the Court disagrees with Costner that the officers acted on a "mere hunch," as opposed to reasonable suspicion. Brotzke's articulable observations provided a reasonable basis to conclude that Costner was unlicensed with a concealed firearm on his person. Thus, the Court will not suppress the firearm as its seizure was lawful.

### III.

For the foregoing reasons, Costner's motion to suppress (ECF No. 18) is DENIED.

SO ORDERED.

Dated: August 2, 2023

                                              s/Laurie J. Michelson
                                              LAURIE J. MICHELSON
                                              UNITED STATES DISTRICT JUDGE